***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gillen. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gillen with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. Defendant was a qualified self-insured.
4. Plaintiff's average weekly wage was $340.23.
5. Plaintiff's back injury, sustained on June 25, 2003, arose out of and in the course of plaintiff's employment with defendant and is compensable.
6. The following items were stipulated into evidence:
 a. The Pre-Trial Agreement, marked as stipulated exhibit 1.
 b. A packet of Industrial Commission forms and medical records applicable to each claim, each packet being marked with its respective I.C. Number and date of injury.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was employed by defendant Pitt County Memorial Hospital as a housekeeper. Plaintiff was 61 years old at the time of the hearing before the Deputy Commissioner and began work for defendant-employer in 1999. Plaintiff went through the 11th grade in school and thereafter completed a GED program.
2. Upon being hired by defendant-employer, plaintiff informed her supervisors that she had asthma. Plaintiff, therefore, was not required to work around cleaning chemicals or fumes. Her duties as a housekeeper involved policing the hallways for trash, taking out the trash and linens, as well as sweeping and mopping the offices. *Page 3 
3. Plaintiff came under the care of Dr. Robert Shaw for her asthma in June 2002. At that time, plaintiff reported to Dr. Shaw that she did not have to work around any strong chemicals and that she tolerated her job well. She reported to Dr. Shaw that she had been hospitalized several times for asthma and had been on chronic, low-dose Prednisone (a steroid used for treatment of severe asthma) for at least two years prior to June 2002. Plaintiff reported several triggers for her asthma to Dr. Shaw, including bad odors, stress, hot or cold weather, dust, and smoke. Dr. Shaw administered pulmonary function studies, the results of which showed severe obstruction in June 2002. Based upon these studies and his examination of plaintiff in June 2002, Dr. Shaw diagnosed moderate persistent asthma with some fixed airway obstruction due to airway remodeling from chronic asthma. Plaintiff saw Dr. Shaw for treatment of her asthma on five occasions between June 2002 and February 2003.
4. On June 25, 2003, in the course of her duties as a housekeeper for defendant-employer, plaintiff developed low back pain while throwing trash bags into a bin. Plaintiff reported the injury to her supervisor. Defendant's Occupational Health Department gave plaintiff Motrin and an ice pack and told plaintiff to avoid heavy lifting for the rest of the day.
5. Plaintiff returned to defendant's Occupational Health Department the following day and was seen by Dr. Marion Swinker. Dr. Swinker diagnosed lumbar strain and advised plaintiff to remain out of work for one week in order to pursue physical therapy.
6. Defendant admitted liability for plaintiff's 25 June 2003 back injury (I.C. No. 348045) with a Form 60 and paid plaintiff temporary total disability benefits for the period from July 3, 2003 to July 7, 2003. On July 7, 2003 plaintiff returned to work with defendant-employer at light duty. Her light duty tasks included cleaning out trash carts on the loading dock. Defendant also filed a Form 28 in this matter. This Form stated that plaintiff had sustained an *Page 4 
injury on June 25, 2003, became disabled on June 26, 2003, and returned to work on July 7, 2003.
7. The trash carts were brought to the loading dock by trash technicians, who would remove the trash from the carts, take out a plug in the bottom of the carts, and push the carts to plaintiff's work station. Plaintiff's job was to spray the inside of the cart with a garden hose using plain tap water. The carts did not fill up with water because the water drained through the drain hole located in the bottom of each cart. There was sometimes an offensive odor of trash on the loading dock, but no chemicals, fumes, or other respiratory irritants. The loading dock area opens to the outdoors.
8. Late in the afternoon of July 10, 2003, plaintiff was brought back to defendant's Occupational Health Department in a disoriented state. Because of concerns regarding her mental status, plaintiff's supervisors drove her home. Although plaintiff did not return to work for defendant subsequent to July 10, 2003, defendant had work available for plaintiff.
9. Plaintiff returned to defendant's Occupational Health Department on July 11, 2003 and was seen by Dr. Swinker. Dr. Swinker could not determine whether plaintiff had had an asthma attack or an anxiety attack on July 10, 2003, but felt that plaintiff needed to be cleared by her personal physician before returning to work.
10. Plaintiff was seen by Dr. Shaw on July 14, 2003. Plaintiff told Dr. Shaw that she was doing well from the standpoint of her asthma. However, she was very emotional and tearful and complained of left facial numbness. Dr. Shaw, who had seen plaintiff multiple times over the preceding year for her asthma, indicated that he saw no reason from the standpoint of her asthma that plaintiff could not return to work at the hospital, and he wrote a note to that effect to Dr. Swinker. However, because of plaintiff's left facial numbness, he referred her to a *Page 5 
neurologist. Dr. Shaw testified that it is "unlikely" that the July 10, 2003 incident would have had a long-lasting effect on plaintiff's asthma condition and that the incident would not have caused permanent damage. Dr. Shaw also stated in his deposition that plaintiff already had chronic, severe asthma in June of 2002 when plaintiff first came under Dr. Shaw's care. Dr. Shaw, recounting plaintiff's July 14, 2003 visit stated: "she certainly was doing pretty well and there wasn't any sign that [the July 10, 2003 incident] had any long-lasting effect on her." Dr. Shaw indicated that the incident temporarily aggravated plaintiff's pre-existing condition.
11. Dr. Swinker testified that, following her return to work after her back injury, plaintiff complained of asthma problems interfering with her physical therapy on July 7, 2003. Dr. Swinker treated plaintiff on July 11, 2003. Dr. Swinker testified that his examination mostly focused on her mental and respiratory status. Dr. Swinker stated that plaintiff was in no respiratory distress and that if plaintiff were having breathing problems, those were personal and non-work related. Dr. Swinker also testified that heat is not a known asthma trigger.
12. Dr. Allen Hayes, who reviewed plaintiff's medical records at defendant's request, testified that plaintiff had longstanding asthma that existed prior to July 10, 2003 and that there was no permanent worsening of plaintiff's chronic underlying asthma as a result of the July 10, 2003 incident. Dr. Hayes further testified that plaintiff was not placed at an increased risk of contracting asthma or suffering a permanent aggravation of her asthma as compared to members of the general public not so employed. During his deposition testimony, he also stated that the July 2003 incident did not cause or significantly contribute to her asthma-related disability. Dr. Hayes has been a member of the Occupational Textile Disease Panel of the North Carolina Industrial Commission for over 20 years. *Page 6 
13. As a result of plaintiff's facial numbness and Dr. Shaw's referral, plaintiff was seen by Dr. Good, a neurologist, who diagnosed her with atypical facial pain and headaches of uncertain etiology. Dr. Good ordered an EEG and MRI of the brain, and when the results of those tests came back normal, he released plaintiff to return to her regular work on July 30, 2003.
14. On August 4, 2003 plaintiff returned to Dr. Shaw for follow-up regarding her asthma. At this visit, she exhibited dypsnea on exertion that Dr. Shaw felt precluded her from returning to work as a housekeeper.
15. Plaintiff returned to defendant's Occupational Health Department on August 12, 2003 and was seen by Ms. Kallweit. Plaintiff reported to Ms. Kallweit that the left side of her face was still not normal and that she was going to seek a second opinion. After examining plaintiff, Ms. Kallweit evaluated plaintiff's back pain as resolved and released plaintiff to return to regular duty work as far as her back injury was concerned. However, Ms. Kallweit noted that Dr. Shaw had plaintiff out of work at this point due to a personal medical condition unrelated to the June 25, 2003 injury.
16. Plaintiff explained to defendant that she continued to have back pain and desired medical treatment, but was told that her case was "closed" and was refused further treatment.
17. On August 22, 2003, due to her continuing back pain, plaintiff sought the care of Dr. Kenneth Hicks, a chiropractor. Dr. Hicks treated plaintiff on a regular basis for several months for complaints of back, neck, and head pain. According to Dr. Hicks, plaintiff reached maximum medical improvement on November 3, 2003 with the full ability to function normally and no permanent impairment or disability. Plaintiff was treated by Dr. Hicks from August 22, 2003 through November 3, 2003, for a total of 19 visits. *Page 7 
18. Plaintiff has not sought further treatment for her back, but she continues under Dr. Shaw's care for treatment of her persistent asthma. Dr. Shaw has assigned permanent work restrictions related solely to plaintiff's asthma condition that preclude plaintiff from returning to work as a housekeeper.
19. There is insufficient evidence of record from which to determine by its greater weight that plaintiff's employment with defendant-employer placed her in a position of greater risk, compared to the general public not so employed, of contracting asthma
20. Plaintiff's employment with defendant did not cause, permanently aggravate or accelerate her development of asthma.
21. The greater weight of the evidence, including plaintiff's testimony and the expert medical opinion given by Dr. Shaw, indicates that the incident of July 10, 2003 was a natural and direct result of plaintiff's specific traumatic incident and resulted in a temporary exacerbation of her pre-existing asthma, which resolved on August 12, 2003.
22. As a result of the temporary exacerbation of her preexisting asthma, plaintiff was disabled from work from July 15, 2003 until August 12, 2003,
23. Plaintiff's stipulated average weekly wage, $340.23, results in a weekly compensation rate of $226.83.
24. Plaintiff does not retain any permanent disability to her back as a result of the compensable injury of June 25, 2003.
25. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground.
 *********** *Page 8 
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On June 25, 2003 plaintiff sustained a compensable back injury. N.C. Gen. Stat. § 97-2.
2. As a result of the compensable back injury, plaintiff was temporarily totally disabled from June 26, 2003 through July 6, 2003 and from July 15, 2003 until August 12, 2003. N.C. Gen. Stat. § 97-29.
3. As a result of her compensable back injury, plaintiff retained no permanent partial disability. N.C. Gen. Stat. § 97-31.
4. Regarding the payment of medical expenses for plaintiff's compensable back injury, the Parsons presumption applies and plaintiff is therefore entitled to the medical treatment provided by chiropractor Hicks through November 3, 2003. Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997). The treatment provided by Dr. Hicks was required to effect a cure, gave relief, and tended to lessen the period of disability. N.C. Gen. Stat. § 97-25.
5. With regard to plaintiff's occupational disease claim, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including, in this case, expert medical testimony.Holly v. ACTS, Inc., 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003);Harvey v. Raleigh Police Department, 96 N.C. App. 28, 35, 384. S.E.2d 549, 553, disc. rev. denied, 325 N.C. 706, 388 S.E.2d 454(1989).
6. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), a plaintiff must prove that the disease is characteristic of individuals engaged in the *Page 9 
particular trade or occupation in which the plaintiff was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and the plaintiff's employment. N.C. Gen. Stat. § 97-53(13);Rutledge v. Tutlex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).Fann v. Burlington Indust., 59 N.C.App. 512, 296 S.E.2d 819 (1982);Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
7. Plaintiff has not proven by the greater weight of the evidence that plaintiff's employment with defendant-employer placed her at greater risk than the general public of contracting asthma or that it placed her in a position of greater risk of suffering a significant exacerbation or aggravation of her pre-existing asthma. N.C. Gen. Stat. § 97-53(13);Rutledge v. Tutlex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983),Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
8. Our courts have long approved causal connections between an initial injury and its direct and natural consequences and have held that injured workers are entitled to be compensated for all disability caused by and resulting from a compensable injury. Horne v. Universal LeafTobacco Processors, 119 N.C. App. 682, 459 S.E.2d 797, disc. rev.denied, 342 N.C. 192, 403 S.E.2d 237 (1995); Heatherly v. MontgomeryComponents, Inc., 71 N.C. App. 377, 323 S.E.2d 29 (1984), disc. rev.denied, 313 N.C. 329, 327 S.E.2d 890 (1985). As a natural and direct result of plaintiff's compensable specific traumatic incident, she suffered a temporary exacerbation of her pre-existing asthma.
9. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground. N.C. Gen. Stat. § 97-88.1.
 *********** *Page 10 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability benefits at a rate of $226.83 per week for the period of July 3, 2003 through July 6, 2003 and from July 15, 2003 through August 12, 2003 for her compensable back injury.
2. Defendants shall pay all medical expenses incurred by plaintiff for reasonably necessary medical treatment for her compensable back injury, including medical treatment provided by chiropractor Dr. Hicks through November 3, 2003.
3. A reasonable attorney's fee of twenty-five percent of the amount due plaintiff is approved for plantiff's counsel and shall be deducted from the amount owed plaintiff and paid directly to her counsel.
4. Defendant is not responsible for plaintiff's medical treatment related to her asthma.
5. No attorney's fees under N.C. Gen. Stat. § 97-88.1 are appropriate to be awarded.
6. Defendant shall pay the costs
This the 12th day of September, 2007.
S/___________________ DANNY LEE McDONALD COMMISSIONER
 CONCURRING: *Page 11 
 S/___________________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER